UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| EDWARD L. MCVAY, | ) | |
| MARY W. MCVAY, | ) | |
| ONE STOP STORAGE, INC, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 1:16-cv-00644-SEB-MJD |
| | ) | |
| vs. | ) | |
| | ) | |
| THE STORE HOUSE COMPANY, | ) | |
| STORE HOUSE OF INDIANAPOLIS LLC, | ) | |
| TSHI STORAGE, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION**

This matter is before the Court on cross-motions for summary judgment: Plaintiffs'
*Motion for Partial Summary Judgment* [Dkt. 91] and Defendants' *Motion for Summary
Judgment* [Dkt. 94]. On April 26, 2017, District Judge Sarah Evans Barker designated the
undersigned Magistrate Judge to issue a report and recommendation pursuant to 28 U.S.C. §
636(b)(1)(B). [Dkt. 100.] For the reasons set forth below, the Magistrate Judge recommends
Plaintiffs' Motion be **DENIED**. [Dkt. 91.] The Magistrate Judge further recommends
Defendants' Motion be **GRANTED IN PART** and **DENIED IN PART**. [Dkt. 94.]

I.    **Background**

Following two rounds of motions to dismiss, this action has been narrowed to one for
breach of contract and fraudulent inducement. The case stems from a contract dispute between
Plaintiffs Edward L. McVay ("Larry"), Mary W. McVay ("Mary"), and One Stop Storage Inc.
("One Stop") (collectively, "Plaintiffs") and Defendants The Store House Company ("Store
House"), Store House of Indianapolis L.L.C. ("SHI"), and TSHI Storage L.L.C. ("TSHI"),

(collectively, "Defendants").[1] Plaintiffs owned and operated a storage facility in Indianapolis, Indiana. In 2007, Plaintiffs sold the property to The Store House Company. It is that transaction, and the resulting Purchase Agreement, that is the subject of this lawsuit.

When confronting cross motions for summary judgment, courts must consider each party's motion individually to determine if that party has satisfied the summary judgment standard. *Indiana Civil Liberties Union Found. Inc. v. Indiana Sec'y of State*, No. 1:15-cv-1356-SEB-DML, 2017 WL 264538, at *2 (S.D. Ind. Jan. 19, 2017). Here, the Court has considered the parties' respective memoranda and the exhibits attached thereto and has construed all facts and drawn all reasonable inferences therefrom in the light most favorable to the respective nonmovant.[2]

In the spring of 2007, Donald Tolva, on behalf of his company, Defendant The Store House Company, began negotiations with Plaintiffs and their broker, Eric Smith, to purchase the storage facility. [Dkt. 95-2 at 28.] These negotiations culminated with the execution of the Purchase Agreement for Industrial Real Estate ("Purchase Agreement") dictating the terms of the sale of Plaintiffs' storage facility. [Dkt. 42-1.] The Purchase Agreement describes two payments to be made to Plaintiffs for the Property: the first a one-time payment of $1,950,000.00 due at closing, [Dkt. 42 at ¶ 46], and the second to be made pursuant to a Contingent Consideration Payment clause ("Contingent Payment" clause) in the contract. [*Id*. at ¶ 47.] The clause states in full the following:

> **G.    CONTINGENT CONSIDERATION PAYMENT:** Seller shall be eligible to receive future contingent earned equity ("Contingent Payment")

---

[1] Former Defendant Donald Tolva ("Tolva"), the owner of The Store House Company who negotiated to purchase the property from Plaintiffs, passed away in October of 2016 and was dismissed from this action. [Dkt. 83.]

[2] The Court notes that the parties' voluminous filings in support of their respective summary judgment motions were both burdensome and unnecessary. Having already reminded the parties that "brevity is the soul of wit" [Dkt. 113], the Court suggests that 165 pages of briefing and more than 2000 pages of exhibits is a questionable method to show there are no disputes of material facts at issue in this case.

at the rate of 50% of any funds available after payment of all "Priority Debt" upon the sale or refinance of the property. ["Priority Debt" shall mean and include all secured and unsecured debt of the property and the LLC or other entity holding title to the Property; and shall include all costs associated with the sale or refinance of the Property.] Such Contingent Payment (a) shall not bear interest; (b) shall be earned and due only upon the sale or refinance of the property; (c) may be a lesser amount but shall not exceed Nine Hundred And Fifty Thousand Dollars ($950,000); (d) shall not confer any rights to the Seller in the Property or the management or operations of the Property; and (e) shall not be an obligation of the Property but shall be an obligation of the LLC or other entity that holds title to the property. When the sum of Nine Hundred And Fifty Thousand Dollars ($950,000) shall have been paid as Contingent Payment or sooner if the Property is sold, Seller shall not be entitled for further Contingent Payment and Seller shall have no further rights under this Agreement. Seller's rights under this Agreement shall not be recorded against the property or the LLC or other entity that holds title to the Property.

It is the intention of this paragraph G that the Seller and Buyer shall share equally in any net proceeds after sale or refinance of the Property, with a maximum amount to the Seller not to exceed $950,000. Seller shall cooperate with Buyer by executing any further document or agreement reasonably requested by Buyer, Buyer's attorney, or Buyer's lender that clarifies the provisions of this paragraph G.

[Dkt. 42-1 at 5.]

The facts surrounding the negotiation of Paragraph G are highly disputed. The parties cannot even agree on who drafted its language. Plaintiffs contend Defendants drafted Paragraph G and any ambiguities should be construed against Defendants. Defendants contend the opposite. What transpired during the negotiations is particularly relevant to Plaintiffs' fraudulent inducement claim. Plaintiffs assert Donald Tolva made false representations that the McVay's relied upon, which induced the McVay's to execute the Purchase Agreement without fully understanding its terms. Mary McVay testified that Tolva repeatedly assured her the $950,000 Contingent Payment would be paid within three to five years. [Dkt. 95-2 at 37.]

A series of emails between the parties tracks a relevant portion of the negotiation process. On August 2, 2007, Mary McVay sent Donald Tolva an email stating: "It would be nice if you

could include 3-5 years in the contingent payment and that even if you refinance and give us a portion then that will still be eligible for additional payment when you sell the facility." [Dkt. 95-7 at 2.] Later the same day, Mary send Tolva another email asking, "In all honesty do you think that we should have an attorney look at the contract, before your acceptance?? I know you are limited in time. How do you feel about this. (sic)." [Dkt. 95-8 at 2.]

Tolva responded: "I can't really give you advice on whether or not you need an attorney to review the contract. But, I would feel better if you did have one. Although I am very concerned that we move rapidly, I will hold on (sic) the Agreement and not move forward with lenders until you get it reviewed. Please let me know if an attorney has reviewed and approved it or if there are questions, feel free to have him call me directly." *Id.*

Mary replied: "Don, I feel [Edward] and I understand the contract. The only thing that I wish were in there besides the 2 things that were added, is that if you refinance and the total 950 is not met that we will receive remainder when facility is sold. Can you do this??" *Id.* Tolva responded: "It's already in the Agreement, but have your attorney write something that you will be comfortable with and I'll look at it. It is part of our deal that you would get the later payment that you are talking about, so I'll certainly work on language to satisfy all. Since you brought it up, I really feel you should go to an attorney. It's large dollars and I don't want any regrets later." *Id.*

A few minutes later, Tolva again wrote to Mary: "Since we have not settled on terms for the Agreement and I am going to put things on hold with possible lenders, it's probably premature for Penny and Beth to spend a day in Indianapolis. So, once again, let's cancel that trip and maybe re-set it latter (sic) after we work things out with your attorney." [Dkt. 95-9 at 2.]

Mary responded: "I just read your email to Larry and he wants to proceed with the contract as it is . . . Larry said if we can't have faith in you then we wouldn't have signed the contract and it is our decision to go with it as it is." [Dkt. 95-10 at 2.]  Eric Smith, a self-storage facility broker assisting the McVay's, then wrote to Tolva: "I just received a new directive from Mary and Larry. They have decided that they are satisfied that you will do what you say you will do and they want to move forward as quickly as possible. They also both decided that they do not want to send this to an attorney. Their decision is final. Please notice that this agreement has not been changed and is exactly what you had sent us. Please sign this agreement and send it back to us at your convenience." [Dkt. 95-11 at 2.]

Tolva replied to Smith and Mary: "I left a voice mail for you explaining that I think Mary and Larry should have an attorney review their Agreement. They had expressed some concern yesterday that they should have an attorney look at it, which I think is understandable. This is now a much different deal. Instead of getting most of their money up front, they now are getting only a contingency which can go to about $1 million, or much less. Further, there is no specified time period other than that they will get their money when the Buyer gets his money. None of us want to go down almost to a closing and then find out there is some issue; or, worse yet, go down the road a year or two and find there is an issue. . . . I am putting everything on hold 'til an attorney reviews it and signed off for them." [Dkt. 95-12 at 2.]

Initially, Mary responded to Tolva that "[w]e will be getting this to an attorney very promptly so we can get it signed off for us." *Id*. However, a few hours later Mary wrote to Smith, copying Tolva: "Eric, could you please ask Don if he would consider drawing up a waiver of rights of an attorney as Larry and I do not want to put out another 500.00 and feel secure in doing this." [Dkt. 95-13 at 2.]

Eric responded: "To make a long story short. <u>Don wants you to get an attorney</u>. He will not feel comfortable closing on this until you do so. So, please call back that attorney send her a copy of your agreement with Don or give me her email address and I will email it to her. Please get a written cost from her; email is fine. See if she will wait until closing to be paid. Then you can take it from your proceeds or mine. You said that you were going to pay me more commission when you receive your money when Don sells this. I believe you. You can add this to that total if you prefer. Also, if your attorney will not wait until closing, let me know where I need to send her $500. We have no choice if you want to move forward with Don you must have an attorney sign off on this. <u>He will not agree to a waiver</u>." *Id.* (emphasis in original).

Following this email discussion, on August 6, 2007, Mary forwarded a copy of the Agreement to David Cook, an attorney in Indianapolis. [Dkt. 95-14 at 2.] On August 7, 2007, Cook reviewed the Agreement and had telephone conferences with Mary and Tolva. [Dkt. 95-16 at 2.] Mary testified that Cook advised her the Agreement should include a timeline for the Contingent Payment. [Dkt. 95-2 at 18.] Based on that advice, Mary handwrote the notation "The Contingent Payment shall be paid by 5 years from the date of the contract" next to Paragraph G. [Dkt. 42-1 at 5; Dkt. 95-2 at 19.]

Tolva rejected the timeline. Mary explained: "He told me he'd rather that not be in there because he needed time – maybe it would take five years and six months like I said before, but he said – he said that he may need that breathing room and so he'd rather that not be in there, so I agreed with him." [Dkt. 95-2 at 20-21.] Mary crossed out the handwritten notation requiring the Contingent Payment to be made within 5 years. [Dkt. 95-2 at 64.] On August 9, 2007, the parties executed the Purchase Agreement. [Dkt. 42-1 at 9-10.] Mary and Edward McVay initialed the crossed-out handwritten notation. [Dkt. 42-1 at 5.]

On or around December 18, 2007, Plaintiffs executed an Amendment to the Purchase Agreement (the "Amendment"). [Dkt. 42 at ¶49; Dkt. 42-2.] Defendants deny executing this Amendment, and the copy submitted by Plaintiffs is signed only by the McVays. [Dkt. 42-2 at 2.] However, Plaintiffs also submitted an email chain between Mary McVay and Donald Tolva tracking the execution of the Amendment. [Dkt. 93-8; Dkt. 93-9.] In the final two emails of the chain, Tolva wrote: "The additional 500 was waiting your signing and returning the Amendment to the Agreement. Then after we received your signed Amendment, a check request was put into the normal monthly cycle for check writing through the lender. Your copy of the Amendment and the check will go out today." On March 17, 2008, Mary responded, in part: "Thank you for the check and copy of the signed addendum." [Dkt. 93-9.][3]

The Amendment, in relevant part, provides:

1. The terms of the Agreement provide that the Seller is eligible for a Contingent Consideration Payment upon the sale or refinancing of the Property. The parties hereby agree that the Buyer shall provide written notice to the Seller of any such sale or refinancing. Such notice to Seller shall be directed to the Seller's at the Seller's address provided for in the Agreement (or such other address as Seller may provide written notice of to Buyer).

2. To facilitate the Closing and to enable the Seller to have sufficient funds after Closing, the Buyer has advanced to Seller the sum of Six Thousand and Seven Hundred Dollars ($6,700). Seller agrees that such funds shall be repaid to Buyer from the Contingent Consideration Payment provided for in the Agreement.

[Dkt. 42-2 at 2.]

In May 2014, Defendants refinanced their loan on the Property. [Dkt. 95 at 18.] At that time, the debt remaining on the Property under a loan agreement with PNC Bank was $2,841,252.37. [Dkt. 95-26.] Defendants obtained a new loan with Citigroup Global Markets Realty Corp. ("Citigroup") in the amount of $2,955,000.00. [Dkt. 95 at 18; Dkt. 95-26.] As part

---

[3] In the copy provided to the Court, the text of Tolva's email appears without a date. [Dkt. 93-9.]

of the refinancing, the PNC loan was paid in full. [Dkt. 95 at 19.] Defendants did not provide written notice of the refinance to Plaintiffs. [Dkt. 42 at ¶58.]

The terms of the Citigroup loan required Defendants to form a new single-purpose entity, TSHI Storage, LLC ["TSHI"], to complete the refinancing. [Dkt. 95 at 18.] Because both entities were controlled by Donald Tolva, the Property was quitclaimed from the old entity, Store House Indianapolis, to the new entity, TSHI. *Id*. The new loan matures on June 6, 2024. *Id*.

**II.** **<u>Summary Judgment Standard</u>**

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party, however, may not rest on mere allegations or denials in its pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).

A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. Stated differently, only disputes over material facts -- i.e., "facts that might affect the outcome of the suit under the governing law" -- will preclude the entry of summary judgment. Id. Disputes over immaterial or irrelevant facts will not. *Id*. at 247-48. When determining whether a genuine issue of material fact exists, the court views the record and all reasonable inferences in the light most favorable to the nonmoving party. *Id*. at 255.  On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

Rather, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994).

### III.    Analysis

The simplicity of this case is belied by the amount of superfluous information in the parties' filings. Plaintiffs' Amended Complaint asserts Defendants breached the Purchase Agreement in two respects: (1) Defendants failed to pay the Contingent Payment when it was due upon the refinance of the Property; and (2) Defendants failed to provide written notice of the refinance as required by the Amendment to the Agreement.[4] Plaintiffs further allege Defendants fraudulently induced them to enter into the Purchase Agreement by misrepresenting the contents of the Agreement.

Defendants seek summary judgment on each of Plaintiffs' claims. Plaintiffs seek summary judgment on the breach of contract claims. The Court will address the Motion as it relates to each claim in turn below. First, however, the Court must resolve evidentiary issues raised by Plaintiffs.

### A.    Evidentiary Issues

Admissibility is a threshold question because a court may consider only admissible evidence in assessing a motion for summary judgment. *Haywood v. Lucent Technologies, Inc.,* 323 F.3d 524, 533 (7th Cir. 2003). Plaintiffs contend that "many" of the emails relied upon by Defendants are hearsay and inadmissible under any hearsay objection. [Dkt. 104 at 6.]  At issue appears to be the string of email communications between Mary McVay and Donald Tolva

---

[4] Plaintiffs also argue Defendants failed to meet the financing and inspection contingencies in the Purchase Agreement, which caused an oral amendment to the Purchase Agreement that Defendants then breached. [Dkt. 104 at 23.] As this "oral amendment" argument asserts a breach of contract claim not alleged in the Amended Complaint, the Court declines to address it.

during the negotiation of the sale of the Property. Mr. Tolva has since passed away, apparently

without ever having given testimony for use in this action.

Setting aside the lack of specificity to Plaintiffs' argument, Mary McVay also

authenticated the emails during the 30(b)(6) deposition of One Stop and testified that the emails

she drafted to Tolva were created on behalf of One Stop in the ordinary course of business. [Dkt.

95-2 at 30.] Ironically, Plaintiffs also rely upon emails from the same string they claim is

inadmissible in their response brief in relation to the fraudulent inducement claim. [Dkt. 104 at

29.]

Hearsay is defined as out-of-court statements "offered in evidence to prove the truth of

the matter asserted." Fed. R. Evid. 801(c).  Out-of-court statements presented for other purposes

are not hearsay. Statements intended to show, for example, the speaker's state of mind, *EEOC v.*

*University of Chicago Hospitals,* 276 F.3d 326, 333 (7th Cir. 2002); *Aetna Life Insurance Co. v.*

*Wise,* 184 F.3d 660, 665–66 (7th Cir.1999), offers and negotiations between parties, *Hydrite*

*Chemical Co. v. Calumet Lubricants Co.,* 47 F.3d 887, 892 (7th Cir. 1995), and notices or

knowledge of a party, *Cook v. Navistar International Transportation Corp.,* 940 F.2d 207, 213

(7th Cir. 1991).

The emails submitted by Defendants are admissible.  Even if the emails are considered

hearsay (and it appears they are being offered for a purpose other than to prove the truth of the

matters asserted in the emails), the Court finds they would be admissible under either Fed. R.

Evid. 803(6) or Rule 807. *See United States v. Dumeisi*, 424 F.3d 566, 576 (7th Cir. 2005) ("Rule

807 permits evidence to be admitted if it has sufficient 'circumstantial guarantees of

trustworthiness' "); *Brokaw v. Boeing Company*, 137 F. Supp. 3d 1082, 1094-95 (N.D. Ill. 2015)

(finding emails were admissible under Fed. R. Evid. 807 because they were "written under

highly reliable circumstances" and "[t]he authors attest under oath that the statements made in their emails are true and accurate"); *see also SEC v. Veros Partners, Inc.*, No. 1:15-cv-00659-JMS-MJD, 2016 WL 3421352, at *6 (S.D. Ind. June 22, 2016). The Court now turns to the substance of the cross motions for summary judgment.

### B. Breach of Contract – Payment of Contingent Payment

In this claim, Plaintiffs assert Defendants breached the Purchase Agreement when they refinanced the Property and failed to pay Plaintiffs the Contingent Payment required by the Agreement. There is no dispute that Defendants refinanced the debt remaining on the Property in May 2014. [Dkt. 95 at 18.] By the clear language of the Agreement, upon such refinance Plaintiffs were "eligible" to receive the Contingent Payment. [Dkt. 42-1 at 5.] The dispute at the heart of this claim centers on the interpretation of this language: "Seller shall be eligible to receive future contingent earned equity ("Contingent Payment") at the rate of 50% of **any funds available after payment of all "Priority Debt"** upon the sale or refinance of the Property." *Id.* (Emphasis added).

Defendants assert the refinance did not trigger their duty to make the Contingent Payment, therefore Plaintiffs' breach of contract claim must fail as a matter of law. Specifically, Defendants argue the refinance must result "in enough funds to extinguish all Priority Debt and generate net proceeds to the Defendants" before Defendants are obligated to make the Contingent Payment. [Dkt. 95 at 32.] At the time of the refinance, the debt remaining on the Property under the loan agreement with PNC Bank was $2,841,252.37. [Dkt. 95 at 18.] The loan amount for the refinance with Citigroup was $2,930,000.00 (inclusive of fees and expenses associated with the refinance). [Dkt. 95 at 19.] As the Priority Debt was not extinguished, Defendants argue, they received no net proceeds therefore do not owe a Contingent Payment.

Plaintiffs assert there were "funds available" after Store House paid the Priority Debt to PNC in conjunction with the refinance, therefore Defendants' failure to make the Contingent Payment entitles Plaintiffs to summary judgment on their breach of contract claim. Plaintiffs cite a Store House Statement of Assets dated December 31, 2014, as demonstrating that Store House had $582,741 in "available funds" upon completion of the refinance. [Dkt. 92 at 18; Dkt. 93-12.] Plaintiffs further argue that, because Store House was a single purpose entity, any profits generated should have remained within the LLC. Instead, Defendants improperly "channel[led] that money away" to related entities. [Dkt. 104 at 27.] For example, Elizabeth Friedlander testified in the Rule 30(b)(6) deposition of Store House that operating money was loaned to and from various Store House entities. [Dkt. 105-2 at 96.]

In short, the parties argue for different interpretations of Paragraph G. Under Defendants' interpretation, there is no obligation to make the Contingent Payment because Priority Debt remains on the Property. Plaintiffs contend "payment of all Priority Debt" occurred when the PNC loan was paid off and the Contingent Payment (half of "any funds available") was owed at that point.

Upon review of the Purchase Agreement, the Court notes a fundamental flaw in Defendants' interpretation of Paragraph G. Defendants assert the Priority Debt must be "extinguished" to trigger the payment obligation; yet, Paragraph G clearly applies when the Property is refinanced. In a refinance, the debt would never be "extinguished" in the way that Defendants contend must occur. The very nature of a refinance requires that a new debt replace an old one. Under Defendants' interpretation of Paragraph G, a refinance would **never** trigger the Contingent Payment obligation – only a sale of the Property could extinguish the Priority Debt. To accept Defendants' interpretation of Paragraph G would render meaningless the reference to a

refinance as a possible triggering event for the Contingent Payment. This would be contrary to the principles of contract interpretation.

When interpreting a written contract, the court should attempt to determine the parties' intent at the time the contract was made, which is ascertained by the language used to express their rights and duties. *Jernas v. Gumz*, 53 N.E.3d 434, 444 (Ind. Ct. App. 2015). The contract is to be read as a whole when trying to determine the parties' intent. *Id.* The Court must make every attempt to construe the contractual language such that no words, phrases, or terms are rendered ineffective or meaningless. *Id.*

Generally, construction of a written contract is a question of law for the trial court and therefore summary judgment is particularly appropriate. *Kutche Chevrolet, Inc. v. Anderson Banking Co.* 597 N.E.2d 1307, 1309 (Ind. Ct. App. 1992). However, if reasonable minds differ as to the meaning of the contract's terms, then an ambiguity exists rendering summary judgment inappropriate. *Id.* This is so because a fact finder would have to weigh the evidence to ascertain facts necessary to construe the contract. Such an exercise is contrary to summary disposition where the material facts generally are not in dispute and the movant is entitled to judgment as a matter of law. *See Plumlee v. Monroe Guar. Ins. Co.*, 655 N.E.2d 350, 354 (Ind. Ct. App. 1995).

Although the parties dispute the interpretation of key terms in Paragraph G, contract terms are not ambiguous merely because the parties disagree about the term's meaning. *Roy A. Miller & Sons, Inc. v. Indust. Hardwoods Corp.*, 775 N.E.2d 1168, 1173 (Ind. Ct. App 2002). Language is ambiguous only if reasonable people could come to different conclusions about its meaning. *Id.* Here, the Court finds the term "Priority Debt" is subject to multiple interpretations. The Agreement defines the term "Priority Debt" as follows:

"Priority Debt" shall mean and include all secured and unsecured debt of the property and the LLC or other entity holding title to the Property; and shall include all costs associated with the sale or refinance of the Property.

[Dkt. 42-1 at 5.]

Defendants assert Priority Debt includes "both the cost to acquire the Property and the cost to build on the Property," though this language does not appear in the Agreement. [Dkt. 95 at 16.] Defendants also assert Priority Debt consists of the entire amount owed on a loan for the Property, which at the time of the refinance was $2,841, 252.37. [Dkt. 95 at 18.] These interpretations not only expand upon the plain language of the Agreement, they are inconsistent with each other. Specifically, Defendants' produced no evidence that their "cost to build on the Property" plus the purchase price ($1.95 million) equaled the amount of either the initial loan or the refinanced loan (each approximately $3 million). The parties agree Defendants made improvements to the Property including construction of four buildings, re-paving the parking lot, and purchasing new computer equipment.[5] But Defendants produced *no* evidence of the amount of money expended on improvements, much less evidence that they expended nearly $1 million doing so. To conclude Priority Debt means the total amount of Defendants' loan (in the absence of evidence of the cost of improvements) would give Defendants carte blanche over the amount of Priority Debt on the Property.

Additionally, under Defendants' interpretation, Priority Debt would exist in perpetuity and could increase at the whim of the Defendants. For example, Defendants could repeatedly refinance the loan, taking additional money out of the property, and never "extinguish" the Priority Debt. As discussed above, this interpretation would render the Contingent Payment

---

[5] Edward McVay testified that he thought Defendants invested approximately $300,000 in improvements on the Property [Dkt. 95-4 at 20].

clause a nullity because it would never be triggered. The Court cannot interpret a contract in such a manner.

Plaintiffs interpret Priority Debt as the initial loan from PNC, which was paid off as part of the refinance. "Regardless of whether new Priority Debt was created by and for a new entity, there should be no dispute that the existing Priority Debt was paid according to the terms of the Purchase Agreement." [Dkt. 110 at 13.] Plaintiffs' approach also expands upon the plain language of the Agreement. The parties could have included language in the Agreement identifying the initial loan as the Priority Debt, but they did not do so. Based on the vague language of the definition, there is no way for the Court to determine the parties' intent as to the meaning of Priority Debt.[6] As such, its construction is a matter for the factfinder. *See Plumlee v. Monroe Guaranty Ins. Co., 655 N.E.2d 350, 355 (Ind. Ct. App. 1995).* Consequently, summary judgment is inappropriate and the Magistrate Judge recommends that both Plaintiffs' and Defendants' motions as to whether Defendants' breached the Agreement by failing to make the Contingent Payment be **DENIED**.[7]

## C. Breach of Contract – Written Notice of Refinance

In this claim, Plaintiffs assert Defendants failed to provide written notice of the May 2014 refinance as required by the Amendment to the Purchase Agreement. The Amendment provides: "The terms of the Agreement provide that the Seller is eligible for a Contingent Consideration Payment upon the sale or refinancing of the Property. The parties hereby agree

---

[6] Indiana applies the rule of construing ambiguities against the drafter (*Fresh Cut, Inc. v. Fazli*, 659 N.E.2d 1126 (Ind. 1995)); however, in this case the parties even dispute who drafted the Agreement.
[7] The parties also dispute the meaning of other terms included in Paragraph G such as "net proceeds" and "any funds available," which lends additional support to the Magistrate Judge's conclusion that extrinsic evidence will need to be employed by the factfinder to determine the parties' intent as to Paragraph G.

that the Buyer shall provide written notice to the Seller of any such sale or refinancing." [Dkt. 42-2 at 2.]

There is no dispute the refinance occurred. The parties disagree as to whether the Amendment is enforceable and whether the duty to notify was triggered by the refinance. Defendants argue the Amendment is not enforceable because Plaintiffs have not produced a fully executed copy of the Amendment.[8]  Plaintiffs also seek summary judgment, arguing the Amendment is enforceable and that its plain language requires notice upon refinance of the Property.

Defendants contend the only evidence that the Amendment was executed by both parties is "the self-serving testimony of Mary McVay to say that she remembers receiving a fully-executed copy" of the Amendment. [Dkt. 98 at 19.] This is incorrect. First, while Defendants criticize Mary McVay's testimony as "self-serving," her deposition testimony is evidence. Further, Mary's testimony was not based on speculation as to what may have transpired with Donald Tolva.  Her testimony is a detailed factual account of the transaction based upon her first-hand experience with Tolva. Plaintiffs also offered an email string in which Tolva expressly states that he had received the Amendment signed by the McVays and issued the check request per the terms of the Amendment. The email from Tolva further indicated the McVay's "copy of the Amendment and the check will go out today." [Dkt. 93-9.] Mary McVay acknowledged receipt of the executed Agreement and the check in a response email. *Id.*

Plaintiffs produced evidence in support of their allegation that the Amendment was executed by both parties. Nevertheless, Defendants argue that despite the emails between Mary

---

[8] In the alternative, Defendants argue the Amendment only requires notice *if* the refinance triggered a Contingent Payment. [Dkt. 98 at 19-20.] As the Priority Debt was not extinguished, Defendants assert, the payment was not triggered and notice was not required. Because the Court has found the term "Priority Debt" to be ambiguous and must be construed by the factfinder, Defendants' argument on summary judgment here also fails.

McVay and Tolva, "it is unclear if the parties ultimately abandoned the Amendment prior to signing." [Dkt. 98 at 6.] Because an integration clause in the Agreement prohibits any alteration of the Agreement without written consent of both parties, Defendants assert the inability to produce such written consent prohibits the Court from finding the Amendment is enforceable as a matter of law. [Dkt. 42-1 at 9.] The Court agrees. But Defendants' argument cuts both ways. If the resolution of the issue as to whether the Amendment was executed and enforceable is a matter for the factfinder, Defendants' motion also must fail as to this claim.  Consequently, the Magistrate Judge recommends both Plaintiffs' and Defendants' motions as to whether Defendants' breached the Agreement by failing to provide written notice of the refinance be **DENIED**.

### D.  <u>Fraudulent Inducement</u>

Finally, Plaintiffs assert Tolva fraudulently induced them to enter into the Agreement by repeatedly assuring Mary that the Agreement required Defendants to pay the McVays $950,000 within three to five years after closing. Defendants argue Plaintiffs' fraud claim fails as a matter of law for two reasons: (1) the claim is barred by Indiana's six-year statute of limitations for fraud claims; and (2) the undisputed facts demonstrate there was no misrepresentation as to the contents of the Agreement. [Dkt. 95 at 21.]

Indiana Code §34-11-2-7(4) provides a six-year statute of limitations for fraud claims. A claim for fraud accrues, and the statute of limitations begins to run, when the plaintiff knew, or in the exercise of ordinary diligence, could have discovered that an injury had been sustained. *First Farmers Bank & Trust Co. v. Whorley,* 891 N.E.2d 604, 610 (Ind. Ct. App. 2008), *trans. denied.* It is not necessary that the full extent of the damage be known or ascertainable but only that some ascertainable damage has occurred. *Id.*

17

Defendants argue Plaintiffs' fraud claim accrued on August 14, 2007 (the date the Purchase Agreement was executed) and, therefore, expired on August 14, 2013, well before the complaint was filed in 2016. Plaintiffs assert that because Tolva assured them he would make the Contingent Payment within five years, the claim did not accrue until five years *after* the execution date when it became clear the Contingent Payment was not forthcoming.

To put the parties' statute of limitations argument into perspective, it is beneficial to understand Plaintiffs' fraud claim. In order to establish fraudulent inducement, Plaintiffs must produce evidence that Defendants' representations of what was included in the Agreement were materially different than the actual terms of the Agreement. Fraudulent inducement occurs when a party is induced through fraudulent misrepresentations to enter into a contract. *Lightning Litho, Inc. v. Danka Indus., Inc.,* 776 N.E.2d 1238, 1241 (Ind. Ct. App. 2002). "If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient." Restatement (Second) of Contracts § 164(1) (1981).

In this claim, Plaintiffs assert they would not have signed the Agreement in the absence of Tolva's promise to pay a $950,000 Contingent Payment within five years. Yet the undisputed facts demonstrate that Mary proposed the five year language upon advice of her attorney by making a handwritten notation in the draft Agreement. When Tolva balked at the time limitation, Mary crossed it out, initialed the change, and signed the Agreement. If Plaintiffs ever had a cognizable claim for fraudulent inducement, and it appears unlikely that they did, it accrued no later than August 14, 2007, when Plaintiffs executed the Agreement. On that date Plaintiffs knew, or should have known, the Agreement did not contain the five-year time limitation they allegedly relied upon.

Even if the claim was not barred by the statute of limitations, however, the Court finds Plaintiffs' claim would fail as a matter of law. Plaintiffs have not established Tolva misrepresented that the five-year time limit was included in the Agreement. Plaintiffs assert Tolva repeatedly assured Mary and others that the Agreement included a three to five year timeline for the payment of a Contingent Payment in the amount of $950,000. They also specifically rely upon two emails between Mary and Tolva wherein Mary states: "The only thing that I wish were in there besides the 2 things that were added, is that if you refinance and the total 950 is not met that we will receive remainder when facility is sold." [Dkt. 95-8 at 2.] Tolva responds, in part: "It is part of our deal that you would get all the later payment that you are talking about . . ." *Id.* Contrary to Plaintiffs' assertions, Tolva makes no mention of a time limitation in this email, only that the payment would occur. In fact, Tolva explicitly stated in a subsequent email to Mary and her real estate broker that "there is no specified time period other than that they will get their money when the Buyer gets his money." [Dkt. 95-12 at 2.]

Additionally, based upon the emails produced, Tolva not only advised Plaintiffs to seek legal advice, he refused to sign the Agreement until an attorney had reviewed it on behalf of Plaintiffs. Even then, when Mary McVay attempted to include the five year limitation on advice of counsel, Tolva again rejected it and she acquiesced. Mary testified that she signed the Agreement understanding that Tolva rejected the five-year time limit because he wanted "breathing room" and she agreed. [Dkt. 95-2 at 20-21.] In light of this evidence, Plaintiffs cannot establish Tolva fraudulently induced them into executing the Agreement by misrepresenting its contents – Plaintiffs signed the Agreement understanding the time limitation was not included. The Magistrate Judge recommends Defendants' motion for summary judgment on Plaintiffs' fraud claim be **GRANTED**.

19

**IV.**     <u>**Conclusion**</u>

Based on the foregoing, the Magistrate Judge recommends Plaintiffs' *Motion for Partial Summary Judgment* [Dkt. 91] be **DENIED** and Defendants' *Motion for Summary Judgment* [Dkt. 94] be **GRANTED IN PART** and **DENIED IN PART**. Consequently, Plaintiffs' breach of contract claims should remain for trial and Plaintiffs' fraudulent inducement claim should be dismissed as a matter of law.

Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), and failure to timely file objections within fourteen days after service shall constitute a waiver of subsequent review absent a showing of good cause for such failure.

Dated:  7 AUG 2017

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Todd J. Ohlms
FREEBORN & PETERS LLP
tohlms@freeborn.com

Verona M. Sandberg
FREEBORN & PETERS LLP
vsandberg@freeborn.com

Emily J. Stine
Freeborn & Peters LLP
estine@freeborn.com

Hamish S. Cohen
MATTINGLY BURKE COHEN & BIEDERMAN LLP
hamish.cohen@mbcblaw.com

Sean P. Burke
MATTINGLY BURKE COHEN & BIEDERMAN LLP
sean.burke@mbcblaw.com

Robert R. Clark
TAFT STETTINIUS & HOLLISTER LLP
rclark@taftlaw.com

Steven C. Shockley
TAFT STETTINIUS & HOLLISTER LLP
sshockley@taftlaw.com