UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| EDWARD L. MCVAY, | ) | |
| MARY W. MCVAY, | ) | |
| ONE STOP STORAGE, INC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:16-cv-00644-SEB-MJD |
| | ) | |
| THE STORE HOUSE COMPANY, | ) | |
| STORE HOUSE OF INDIANAPOLIS, LLC, | ) | |
| TSHI STORAGE, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM ORDER
ON MAGISTRATE JUDGE'S REPORT & RECOMMENDATIONS (DKT. 124)**

Now before the Court are *Defendants' Objections*, Dkt. 126, to Magistrate Judge

Mark J. Dinsmore's *Report and Recommendations*, Dkt. 124, on *Plaintiffs' Motion for*

*Partial Summary Judgment*, Dkt. 91, and *Defendants' Motion for Summary Judgment*.

Dkt. 94.

In this diversity case, plaintiffs Edward "Larry" McVay ("Larry"), his wife Mary

McVay ("Mary"), and their company One Stop Storage, Inc. ("One Stop") (collectively,

"the McVays"), sued defendants Donald Tolva ("Tolva"), who, having died during the

pendency of this litigation, has been dismissed, Dkt. 83, and various entities controlled by

Tolva ("the Tolva Entities"), to wit, The Store House Company ("Store House"), Store

House of Indianapolis, LLC ("Store House Indianapolis"), and TSHI Storage, LLC

("TSHI Storage"), in tort and contract, in connection with the 2007 sale of certain real

property in Indianapolis ("the Property") by the McVays to Store House on a traditional land-sale contract ("the Contract") with an untraditional compensation structure ("the Contingent Payment Clause").

We referred the parties' crossmotions for summary judgment to the magistrate judge, Dkt. 100, whose report has been issued and is objected to in part by the Tolva Entities. For the reasons below, we adopt the magistrate judge's unobjected-to recommendations but sustain the Tolva Entities' objections. Accordingly, *Plaintiffs' Motion for Partial Summary Judgment* is DENIED and *Defendants' Motion for Summary Judgment* is GRANTED in full.

## Facts and Procedural History

The facts are fully set out in the magistrate judge's report. R.&R. 1–9. In brief, the McVays bought the Property in 2003 with the intention of developing and operating a consumer self-storage business there. In 2007, the McVays began negotiating with Tolva, an Illinois businessman who operated several such businesses across the country, to sell the Property to Store House, Tolva's umbrella company.

In their initial negotiations, the parties contemplated a purchase price in the neighborhood of $3 million. But, as agreed and executed by the McVays and Tolva, the Contract provided for a $1.95 million purchase price to be paid up front, with the Contingent Payment Clause providing for one or more future payments, contingent on the sale or refinance of the Property, which, in total, "c[ould] go to about $1 million, [$950,000, to be precise,] or much less[,]" without any "specified time period" for

payment. Dkt. 95 Ex. K, at 2 (e-mail from Tolva to Mary). The Contract was executed on or about August 14, 2007.

As a condition of securing initial financing for the deal, Tolva created Store House Indianapolis, an LLC, the single purpose of which was to hold title to the Property. In 2014, Tolva refinanced the Property ("the 2014 Refinance"), then still in the hands of Store House Indianapolis. As a condition of securing the refinance, Tolva created a new entity, TSHI Storage, another LLC, the single purpose of which was to hold title to the Property. The Property was quitclaimed from Store House Indianapolis to TSHI Storage, and Store House Indianapolis dissolved.

Upon learning of the 2014 Refinance, the McVays believed that the refinance had triggered the Tolva Entities' obligation to make a Contingent Payment under the Contract, which the Tolva Entities had failed to do. The McVays filed this lawsuit on March 22, 2016. Dkt. 1.

After two motions to dismiss were disposed of by the Court, *see McVay v. Store House Co.*, No. 16-cv-644, 2017 WL 676395, at *1 (S.D. Ind. Feb. 2, 2017) (Dkt. 85), the McVays narrowed their claims to two: Count I, Breach of Contract, and merged Counts II and IV, Fraud in the Inducement. *See id.* at *3 n.3 (taking two separately pleaded fraud claims as one claim). On March 27, 2017, the McVays moved for partial summary judgment on the breach of contract claim. The same day, the Tolva Entities moved for summary judgment on both claims. We referred the motions to Magistrate Judge Dinsmore for a report and recommendation.

The magistrate judge's report (1) resolved certain evidentiary issues, R.&R. 9–11; (2) concluded that the Contingent Payment Clause was ambiguous, precluding judgment as a matter of law for either party, without, however, determining whether the parties' designated extrinsic evidence presented a genuine dispute of material fact, *id.* at 11–15; (3) concluded that a purported modification to the Contract ("the Amendment"), *inter alia* entitling the McVays to notice from the Tolva Entities of a sale or refinance of the Property ("the Notice Clause"), could not be enforced without proof of execution and that such proof was a matter for resolution by the trier of fact, *id.* at 15–17; and, finally, (4) concluded that the McVays' fraud claim failed for lack of actionable misrepresentation and was in any event barred by the applicable limitations period. *Id.* at 17–19. Accordingly, Magistrate Judge Dinsmore recommended that the parties' crossmotions be denied as to breach of the Contingent Payment and Notice Clauses, and that the Tolva Entities' motion be granted as to the fraud claim. *Id.* at 20.

The Tolva Entities object to the recommended denial of their motion relating to the breach of contract claim. The McVays respond that the breach of contract claim either must be submitted to the factfinder for resolution, or, in the alternative, that they are entitled to judgment as a matter of law on that claim. The McVays do not object to the recommended denial of the fraud claim. We thus confine our ruling here to the contract claim.

## Standard of Review

As we noted in reviewing the magistrate judge's report and recommendation on the Tolva Entities' motions to dismiss,

> Rule 72(b) of the Federal Rules of Civil Procedure requires a party who disagrees with a magistrate judge's report and recommendation on a dispositive motion to file "specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 739 (7th Cir. 1999). "The district court 'makes the ultimate decision to adopt, reject, or modify' the report and recommendation, and it need not accept any portion as binding; the court may, however, defer to and adopt those conclusions where a party did not timely object." *Jamerson v. Colvin*, 2013 WL 6119245, at *1 (S.D. Ind. Nov. 21, 2013). Upon a timely objection, the district court then determines, *de novo*, "any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3); *see also* 28 U.S.C. § 636(b)(1); *Remy Inc. v. Tecnomatic, S.P.A.*, 2013 WL 1311095, at *1 (S.D. Ind. Mar. 26, 2013).

*McVay v. Store House Co.*, No. 1:16-cv-644, 2017 WL 676395, at *2 (S.D. Ind. Feb. 21, 2017). Accordingly, our *de novo* review of the magistrate judge's report is conducted under the same standard employed by the magistrate judge.

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

## **Analysis**

## I. Breach of Contract

"The essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages." *McCalment v. Eli Lilly & Co.*, 860 N.E.2d 884, 894 (Ind. Ct. App. 2007).[1] We hold, for the reasons explained below, that the McVays' claim for breach of the Contingent Payment Clause fails for lack of proof of the second element; their claim for breach of the Notice Clause fails for lack of proof of the third.

### A. The Tolva Entities Did Not Breach the Contingent Payment Clause

To determine whether the Tolva Entities breached the Contract following the 2014 Refinance, we must examine the Contract itself to interpret its provisions. "The ultimate goal of any contract interpretation is to determine the intent of the parties at the time that they made the agreement." *Citimortgage, Inc. v. Barabas*, 975 N.E.2d 805, 813 (Ind. 2012) (citing *First Fed. Sav. Bank of Ind. v. Key Mkts., Inc.*, 559 N.E.2d 600, 603 (Ind. 1990)). In the first instance, the parties' intent "is to be determined from the four corners" of the instrument; "[i]t is expressed by the clear language thereof." *Ruff v. Charter Behavioral Health Sys. of Nw. Ind., Inc.*, 699 N.E.2d 1171, 1176 (Ind. Ct. App. 1998).

"Clear and unambiguous terms in the contract are deemed conclusive, and when they are present we will not construe or look to extrinsic evidence, but will merely apply the contractual provisions." *AM Gen. LLC v. Armour*, 46 N.E.3d 436, 440 (Ind. 2015) (quoting *Ryan v. Ryan*, 972 N.E.2d 359, 364 (Ind. 2012)). "If the language is clear and

---

[1] The Contract provides that Indiana law governs its construction, Dkt. 42 Ex. A, at 9, a point neither party disputes.

unambiguous, it must be given its plain and ordinary meaning[,]" *Reuille v. E.E. Brandenberger Constr., Inc.*, 888 N.E.2d 770, 771 (Ind. 2008) (alterations, quotations, citation omitted), "unless, from the contract and the subject matter thereof, it is clear that some other meaning was intended[,]" *DLZ Ind., LLC v. Greene Cnty.*, 902 N.E.2d 323, 327 (Ind. Ct. App. 2009), and "[w]e may not construe unambiguous language to give it anything other than its clear, obvious meaning[.]" *Broadbent v. Fifth Third Bank*, 59 N.E.3d 305, 311 (Ind. Ct. App. 2016) (citing *Hepburn v. Tri-Cnty. Bank*, 59 N.E.2d 378, 384 (Ind. Ct. App. 2006)).

The "plain language" of a contractual provision must be "read[] in context and, whenever possible, constru[ed] . . . so as to render each word, phrase, and term meaningful, unambiguous, and harmonious with the whole." *Barabas*, 975 N.E.2d at 813. "Contracts should not be so narrowly interpreted as to frustrate their obvious design or so loosely interpreted as to relieve a party of liability fairly within the scope of the contract's terms." *Chi. Southshore & So. Bend R.R. v. Itel Rail Corp.*, 658 N.E.2d 624, 633 (Ind. Ct. App. 1995) (citing *Radio Picture Show P'ship v. Excl. Int'l Pictures, Inc.*, 482 N.E.2d 1159, 1167 (Ind. Ct. App. 1985)).

"While courts are bound to enforce contracts where intentions of the parties are clearly stated therein, a different problem arises where a contract is ambiguous or uncertain in its terms." *First Fed.*, 559 N.E.2d at 604. If the contract language "is ambiguous, inconsistent, or uncertain," such that "reasonably intelligent people could honestly find the contract's provisions susceptible to more than one interpretation[,]" *Dempsey v. Carter*, 797 N.E.2d 268, 273 (Ind. Ct. App. 2003), "[r]ules of contract

construction and extrinsic evidence may be employed in giving effect to the parties'

reasonable expectations." *First Fed.*, 559 N.E.2d at 604. "Courts may properly consider

all relevant evidence to resolve the ambiguity[,]" no matter its source. *Tender Loving*

*Care Mgmt., Inc. v. Sherls*, 14 N.E.3d 67, 72 (Ind. Ct. App. 2014) (citing *Univ. of So. Ind.*

*Found. v. Baker*, 843 N.E.2d 528, 535 (Ind. 2006) (abrogating latent-patent distinction)).

In determining intent from ambiguous language,

> it is the court's obligation and duty to consider [the parties']
> intention in the light of the surrounding circumstances which
> existed at the time the contract was made. The court should
> consider the nature of the agreement, together with all the
> facts and circumstances leading up to the execution of the
> contract, the relation of the parties, the nature and situation of
> the subject matter, and the apparent purpose of making the
> contract.

*Ruff*, 699 N.E.2d at 1176 (quotations and citation omitted).

　　　　Contract interpretation is a question of law and, as such, "particularly appropriate"

for summary judgment. *Rusnak v. Brent Wagner Architects*, 55 N.E.3d 834, 840 (Ind. Ct.

App. 2016). If, however, the contract is ambiguous and extrinsic evidence is admitted to

resolve the ambiguity, its weighing should be left to the trier of fact, *id.* at 840–41, unless

there is no genuine factual dispute presented by the record on summary judgment.

*Zollman v. Geneva Leasing Assocs., Inc.*, 780 N.E.2d 387, 392 (Ind. Ct. App. 2002).

　　　　The Contingent Payment Clause provides as follows[2]:

## G.  CONTINGENT CONSIDERATION PAYMENT:
**Seller shall be eligible to receive future contingent earned**

---

[2] Here, "Seller" is One Stop, the McVays, and their assigns; "Buyer" is Store House and its
assigns; and "the Property" is the Property. Dkt. 42 Ex. A, at 2. As discussed further below, "the
LLC" is not identified.

**equity ("Contingent Payment") at the rate of 50% of any funds available after payment of all "Priority Debt" upon the sale or refinance of the property. ["Priority Debt" shall mean and include all secured and unsecured debt of the property and the LLC or other entity holding title to the Property; and shall include all costs associated with the sale or refinance of the Property.]** Such Contingent Payment (a) shall not bear interest; (b) shall be earned and due only upon the sale or refinance of the property; (c) may be a lesser amount but shall not exceed Nine Hundred And Fifty Thousand Dollars ($950,000); (d) shall not confer any rights to the Seller in the Property or the management or operations of the Property; and (e) shall not be an obligation of the Property but shall be an obligation of the LLC or other entity that holds title to the property. When the sum of Nine Hundred And Fifty Thousand Dollars ($950,000) shall have been paid as Contingent Payment or sooner if the Property is sold, Seller shall not be entitled for further Contingent Payment and Seller shall have no further rights under this Agreement. Seller's rights under this Agreement shall not be recorded against the property or the LLC or other entity that holds title to the Property.

**It is the intention of this paragraph G that the Seller and Buyer shall share equally in any net proceeds after sale or refinance of the Property, with a maximum amount to the Seller not to exceed $950,000.** Seller shall cooperate with Buyer by executing any further document or agreement reasonably requested by Buyer, Buyer's attorney, or Buyer's lender that clarifies the provisions of this paragraph G.

Dkt. 42 Ex. A, at 5 (original brackets; main-text emphasis added).

The first two sentences address the question presented by this case, namely, what is the trigger for a Contingent Payment under the Contract. Sadly, though, this language suffers from remarkably poor draftsmanship (even its author anticipated the need for "clarifi[cation]," *id.*) and raises more questions than it answers. To whom, and, more importantly for this case, from what source, must the funds be "available"? Does "funds

available . . . upon . . . sale or refinance" refer to whatever funds the payor happens to have on hand following such sale or refinance (the McVays' position), or are the funds those specifically derived from such sale or refinance (the Tolva Entities' position)? *Compare Webster's Third New International Dictionary* 2518 (Philip B. Gove ed., 1993) (s.v. 1 "upon" 10a(1)) ("immediately following on"; "very soon after") *with id.* (s.v. 1 "upon" 10a(2), 10b) ("in answer to"; "on the occasion of"). If the former meaning is intended, then what is the meaning of "available"?

Moreover, what is "the LLC"? That term is nowhere defined in the Contract and has never been referenced outside the Contingent Payment Clause; clearly, the parties to the Contract are either natural persons or corporations. Dkt. 42 Ex. A, at 2 ("Parties"). Though "the mere fact that a term is not defined does not render the contract ambiguous[,]" *Millspaugh v. Ross*, 645 N.E.2d 14, 16 (Ind. Ct. App. 1994), neither plain and ordinary usage nor Indiana common law supplies an obvious referent here. *See Secura Supreme Ins. Co. v. Johnson*, 51 N.E.3d 356, 360 (Ind. Ct. App. 2016) (looking to latter for meaning of undefined contract term). Similarly, what is an "other entity holding title to the Property," such that the Contract purports to obligate it?

Finally, and perhaps most critically, *see* R.&R. 15 (finding definition ambiguous so as to preclude parties' crossmotions for summary judgment), what is the meaning of the definition of "Priority Debt"? Distributing the modifiers over the head nouns of the definition generates the four phrases "secured . . . debt of the [P]roperty," "unsecured debt of the [P]roperty," "secured . . . debt of . . . the LLC or other entity," and "unsecured debt of . . . the LLC or other entity." Taken literally, "debt of the property" is a self-

contradicting notion, as property cannot owe debt. "Secured debt of the Property" could be an imprecise expression for "debt secured by the Property," *see* Dkt. 42 Ex. A, at 5 (where "obligation of the [P]roperty" likely means "security interest in the Property"), but "unsecured debt of the Property" is apparently simply meaningless.

Whatever else the Contingent Payment Clause means, it unambiguously does not entitle the McVays to the specific relief they seek, to wit, payment of $291,370.50. Pls.' Resp. Defs.' Obj. 15; Pls.' Br. Supp. Summ. J. 18. The Contingent Payment Clause provides that payment shall be made to the McVays "at the rate of 50% of any *funds available* after payment of all 'Priority Debt' upon the sale or refinance of the property." Dkt. 42 Ex. A, at 5 (emphasis added). The McVays contend that this provision entitles them to half the value of the *assets*, exclusive of the Property (but why stop there?), on the books of the Tolva Entity holding title to the Property immediately following a sale or refinance of the Property. Store House Indianapolis, before it was dissolved following transfer of the Property to TSHI Storage as a condition of the 2014 Refinance, *see* Dkt. 93 Ex. B 373:7–374:2, held $582,741 in "Other Assets," Dkt. 93 Ex. K, that is, assets other than the Property, including $42,677 cash, $120,623 unamortized loan costs, and $294,505 debts receivable.

The Contract will not, in this respect, yield to the meaning the McVays advance for it. "Funds" are "[m]oney or other assets, such as stocks, bonds, or working capital available to pay debts, expenses, and the like[,]" *Fund* (2.), Black's Law Dictionary (7th ed. 1999), "money on deposit which is held at a specified place and on which checks or drafts can be drawn," *Webster's* 921 (s.v. 1 "Fund" 4b.), or "available pecuniary

resources ordinarily including cash and negotiable paper that can be converted to cash at any time without loss." *Id.* (s.v. 1 "Fund" 5.). The gravamen of these definitions is that "funds" are not synonymous with all "assets," but instead are specifically cash or liquid noncash assets that are readily accessible and available for the satisfaction of obligations. The unamortized loan costs, debts receivable (nowhere said to have been held in the form of negotiable paper), and the other noncash, illiquid assets on the books of Store House Indianapolis do not come within these definitions.

If, however, the McVays' reading of the Contingent Payment Clause is otherwise correct, they may yet be entitled to half of the $42,677 cash held by Store House Indianapolis, along with half of other assets, if any, held by Store House Indianapolis at the time of the 2014 Refinance which a reasonable trier of fact could find to be "funds" within the meaning of the Contingent Payment Clause.

The interpretation of a contract is a search for the intent of the parties. *Barabas*, 975 N.E.2d at 813. The above recited interpretive difficulties notwithstanding, the parties have expressly declared their intent in agreeing to the Contingent Payment Clause in the following plain, ordinary, and unambiguous terms: "It is the intention of [the Contingent Payment Clause] that the Seller and Buyer shall share equally in any net proceeds after sale or refinance of the Property[.]" Dkt. 42 Ex. A, at 5. Accordingly, we shall interpret the operative language of the Contingent Payment Clause in light of this plainly and unambiguously expressed intent, "reading [the operative language] in context and, whenever possible, construing it so as to render each word, phrase, and term meaningful, unambiguous, and harmonious with the whole." *Barabas*, 975 N.E.2d at 813.

"Proceeds" are "what is produced by or derived from something (as a sale, investment, levy, [or] business) by way of total revenue"; "the total amount brought in"; "yield, returns." *Webster's* 1807 (s.v. "proceeds" 1a). Thus, loan proceeds are simply the amount of money received in a loan from the lender. *See, e.g., Prudential Ins. Co. of Am. v. Exec. Estates, Inc.*, 369 N.E.2d 1117, 1123–24 (Ind. Ct. App. 1977) (mortgage proceeds). "Net proceeds" specifically are "[t]he amount received in a transaction minus the costs of the transaction (such as expenses and commissions)." *Proceeds*, Black's Law Dictionary (7th ed. 1999) (s.v. "net proceeds"); *accord* Dkt. 42 Ex. A., at 5 ("all costs associated with the sale or refinance" to be subtracted from proceeds of Property sale or refinance). Thus, net loan proceeds are the amount of money received from the lender, net of the cost of procuring the loan. This gives a firmer meaning to the phrase "funds available . . . upon the sale or refinance of the Property." Dkt. 42 Ex. A, at 5. The funds available for division and distribution to the McVays upon sale or refinance are, first of all, the total amount of money brought in from the sale or refinance minus the costs of the transaction, or "all costs associated with the sale or refinance . . . ." *Id.*

While the transaction costs are included both in the concept of net proceeds and in the Contract's definition of "Priority Debt," the remainder of the definition of "Priority Debt," and its application to this case, is yet to be determined. Contingent Payment is triggered under the Contract only "after payment of all 'Priority Debt' . . . ." *Id.* The Tolva Entities contend that the McVays are entitled to no Contingent Payment as a result of the 2014 Refinance because the 2014 Refinance did not "extinguish[]" all Priority Debt, Defs.' Obj. R.&R. 9, that is, "all secured and unsecured debt of the [P]roperty and

the LLC or other entity holding title to the Property . . . ." Dkt. 42 Ex. A, at 5. Store House Indianapolis, the Tolva-controlled LLC holding title to the Property in 2014, owed $2,841,252.37 debt on the Property before the 2014 Refinance, Dkt. 126 Ex. C, at 2, and its successor Tolva-controlled LLC, TSHI Storage, owed $2,930,000 debt on the Property after the 2014 Refinance. Dkt. 95 Ex. X. The Tolva Entities argue that a Contingent Payment is due "after payment of *all* 'Priority Debt . . . [,]'" Dkt. 42 Ex. A, at 5 (emphasis added); that TSHI Storage, the post-refinancing title holder, still owed debt on the Property after the 2014 Refinance; and that, therefore, Priority Debt remained on the Property after the 2014 Refinance and no Contingent Payment was then due.

The magistrate judge's report concluded that the Tolva Entities' reading of the Contract cannot be sustained in this respect, and that "Priority Debt" must exclude replacement debt incurred as the result of refinancing the preexisting debt on the Property, because the contrary conclusion would effectively, and impermissibly, render completely nugatory all references to "refinance" in the Contingent Payment Clause:

> [The Contingent Payment Clause] clearly applies when the Property is refinanced. In a refinance, the debt would never be "extinguished" in the way that [the Tolva Entities] contend must occur. The very nature of a refinance requires that a new debt replace an old one. Under [the Tolva Entities'] interpretation of [the Contingent Payment Clause], a refinance would *never* trigger the Contingent Payment obligation—only a sale of the Property could extinguish the Priority Debt. To accept [the Tolva Entities'] interpretation of [the Contingent Payment Clause] would render meaningless the reference to refinance as a possible triggering event for the Contingent Payment. This would be contrary to the principles of contract interpretation.

R.&R. 12–13. We agree.

14

Indiana courts "will not construe a contract such that a term is meaningless when it is possible to do otherwise." *Rusnak*, 55 N.E.3d at 841 (citing *Storch v. Provision Living, LLC*, 47 N.E.3d 1270, 1273 (Ind. Ct. App. 2015)). Refinancing is "[a]n exchange of an old debt for a new debt, as by negotiating a different interest rate or term or by repaying the existing loan with money acquired from a new loan." *Refinancing*, Black's Law Dictionary (7th ed. 1999). As the magistrate judge's report correctly observes, because every refinancing incurs new or replacement debt in place of the old debt being refinanced, if the Property were required to be completely unencumbered by debt as a condition precedent to Contingent Payment under the Contract, the provision for Contingent Payment specifically "upon . . . refinance" would be nullified and rendered completely meaningless. Dkt. 42 Ex. A, at 5.[3] Moreover, the Contingent Payment Clause unambiguously contemplates the possibility of multiple payments, up to a maximum, in the event of repeated refinancing. *See id.* ("When the sum of Nine Hundred And Fifty Thousand Dollars . . . shall have been paid as Contingent Payment or sooner if the Property is sold," the Tolva Entities' obligation under the Contract ceases.). Accordingly, in order to render each provision of the Contract meaningful and harmonious with the

---

[3] Nowhere in the summary judgment materials before us, neither in the briefs nor in the evidentiary designations, have the Tolva Entities hypothecated a set of circumstances, consistent with their reading of the Contract and "Priority Debt," under which Contingent Payment would be made to the McVays upon a refinance. The briefs, including the Tolva Entities' objection to the report and recommendation, simply ignore the question. Counsel for the Tolva Entities on the 2014 Refinancing made an ultimately unsuccessful attempt to resolve the question in the Tolva Entities' favor. Dkt. 93 Ex. J 71:2–82:5.

whole, "Priority Debt" must exclude replacement debt incurred as the result of refinancing.

This conclusion, in turn, points the way to a proper understanding of "future contingent earned equity," *id.*, which is the Contract's fuller description of the "Contingent Payment" the McVays are to receive under the Contingent Payment Clause. *Id.* Neither party has endeavored to give an account of what this phrase means. *See* Dkt. 105 Ex. B 80:11–81:4 (Tolva Entities' corporate deponent unable to account for use of "equity"). The "contingent" nature of the payment is clear from the face of the instrument: payment is contingent on a sale or refinance of the Property. ("Future," of course, must be empty surplusage, as there is no "past" contingency.) The phrase "earned equity," standing alone, most naturally suggests an earned ownership stake in the Tolva Entities' business: "equity" in the sense of "[a]n ownership interest in property, esp[ecially] in a business[,]" *Equity* (8.), Black's Law Dictionary (7th ed. 1999), or "a risk interest or ownership right in property[.]" *Webster's* 769 (s.v. "equity" 3c). *See, e.g, Brill v. Marandola*, 540 F. Supp. 2d 563, 567 (E.D. Pa. 2008); *Aukeman v. Aukeman*, No. 267326, 2007 WL 1695886, at *1 (Mich. Ct. App. June 12, 2007). But the Contract unambiguously establishes the contrary: Contingent Payment, or "future contingent earned equity," "shall not confer any rights to the Seller in . . . the management or operation of the Property[.]" Dkt. 42 Ex. A, at 5.

Rather, in light of the conclusions drawn from the provisions for "net proceeds" and "refinancing," it is clear that "equity" must be taken to mean "[t]he amount by which the value of or an interest in property exceeds secured claims or liens; the difference

between the value of the property and all encumbrances upon it . . . [,]" *Equity* (7.),

Black's Law Dictionary (7th ed. 1999), or "the money value of a property or of an

interest in a property in excess of claims or liens (as mortgaged indebtedness) against

it[.]" *Webster's* 769 (s.v. "equity" 3b). To illustrate: Take a hypothetical property

purchased in 2010 for $1,000,000, financed with a purchase-money mortgage in the

amount of the purchase price (excluding costs). Over the next ten years, the property's

value appreciates 25% and the vendee pays down 25% of the loan principal. In 2020, the

vendee holds $500,000 equity in the property: the property is worth $1,250,000,

encumbered by indebtedness in the amount of $750,000, the difference between the two

figures being $500,000.

If she sells the property at full market value in 2020, the vendee (now vendor)

realizes her $500,000 equity in the property by receiving $1,250,000 sale proceeds,

subtracting $750,000 to retire the outstanding debt, and pocketing the $500,000

difference. Similarly, if the vendee, instead of selling the property in 2020, chooses to

refinance her mortgage, she realizes her $500,000 equity by borrowing against the fully

appreciated value of the property: she receives $1,250,000 in loan proceeds, subtracts

$750,000 to retire the old debt, and pockets the $500,000 difference, all while incurring

replacement debt of $1,250,000. If these transactions were governed by the Contract's

Contingent Payment Clause, both would trigger Contingent Payment to the McVays of

$250,000: 50% of the net proceeds from the transaction after payment of old debt. This is

the only interpretation of the Contingent Payment Clause that gives harmonious effect to

the provisions for the parties' sharing the net proceeds of a sale or refinance by dividing the equity realized in the transaction.

The benefit to the Tolva Entities of this arrangement, and the corresponding detriment to the McVays, is obvious. The Contract provided for a "purchase price" of $1,950,000. Dkt. 42 Ex. A, at 2. But the market value of the Property was greater by approximately one third, in the neighborhood of $3,000,000. *See, e.g.,* Dkt. 105 Ex. U, at 2 (letter dated March 21, 2007, expressing Tolva's interest in Property at price of $3,400,00); *see generally* Pls.' Br. Opp. Summ. J. 8 (citing evidence). By securing initial financing against the full market value of the Property, rather than securing a simple purchase-money mortgage, Tolva was able immediately to extract approximately $1,000,000 in loan proceeds to do with as he pleased. Thereafter, with the Property already fully leveraged, any money due the McVays under the Contingent Payment Clause would derive, not from the difference between the purchase price and the market value of the Property, but solely from appreciation of the Property's value over its value in 2007—assuming Tolva did not pay down much of the loan principal, as in fact he did not. *Compare* Dkt. 98 Ex. S, at 2 (initial financing of $3,060,000 in 2007) *with* Dkt. 126 Ex. C, at 2 (outstanding debt of $2,841,252.37 in 2014). In effect, Tolva secured an approximately $1,000,000 interest-free loan from the McVays, *see* Dkt. 42 Ex. A, at 5 ("Such Contingent Payment . . . shall not bear interest . . . ."), which the Tolva Entities would be required to repay in its entirety only in the unlikely event that the Property appreciated by approximately $2,000,000 at the time of sale or refinance, or by fully two

thirds of its market value in 2007, generating proceeds of $5,000,000, less debt retirement of $3,000,000, leaving $2,000,000 realized equity to be divided equally.

In light of the above discussion, we conclude that the Tolva Entities did not breach the Contract by failing to remit funds to the McVays following the 2014 Refinance. In that transaction, TSHI Storage borrowed $2,930,000. Dkt. 126 Ex. C, at 2. Of that amount, $2,841,252.37 was paid to retire the old debt from the initial financing of the Property in 2007. *Id.* The difference, $58,747.63, was expended to pay off the costs of the transaction in part, *see id.* at 2–3, full payment of which required the additional contribution of a $5,000 application fee and a $20,000 good faith deposit. *Id.* at 2. Thus, neither TSHI Storage nor any other Tolva Entity received net proceeds from, or realized equity from, from the 2014 Refinance, *see id.* at 2–3 ($2,930,000 loan against $2,955,000 total charges), and the Contingent Payment Clause was not triggered.

A full interpretation of the Contract would require a determination of the full meaning of the "secured and unsecured debt of the [P]roperty and the LLC or other entity holding title to the Property." *Id.* As already noted, "unsecured debt of the Property" is a meaningless phrase to which neither we nor either of the parties' arguments or evidence can give effect. "Secured debt of the Property" may be given meaning when read as "secured debt on the Property" or, equivalently, "debt secured by the Property," but must exclude replacement debt incurred in refinancing to avoid vitiating much of the Contingent Payment Clause. We would have to ask further: Did the parties contemplate the priority of *any* debt the Tolva Entities elected (and were able) to secure with the Property, or only such debt as was incurred in connection with the owning and operating

of the Property? Notably, not even the Tolva Entities attempt to advance or defend such a broad interpretation of "Priority Debt." *See* R.&R. 14 (noting Tolva Entities' argument that Priority Debt "includes 'both the cost to acquire the Property and the cost to build on the Property[.]'" (quoting Defs.' Br. Supp. Summ. J. 16)). Similarly, what did the parties understand by "secured and unsecured debt of the LLC or other entity holding title to the Property," given that no meaning of "the LLC" appears from the Contract, common usage, or common law?

These questions remain open. We have already concluded as a matter of law that the Contract was not breached by the Tolva Entities' failure to remit Contingent Payment to the McVays following the 2014 Refinance. "[I]f it is not necessary to decide more, it is necessary not to decide more[,]" *PDK Labs. Inc. v. U.S. D.E.A.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and in the judgment), or, more plainly, sufficient unto the day are the evils thereof.

### B.  The McVays Were Not Damaged by the Tolva Entities' Assumed Breach of the Notice Clause

The McVays have produced a document purporting to be an "Amendment to Purchase Agreement" ("the Amendment"), signed by Larry and Mary but not by Tolva, dated December 18, 2007. Dkt. 42 Ex. B, at 2. It contains the Notice Clause, which provides as follows:

> The terms of the [Contract] provide that the Seller is eligible for a Contingent Consideration Payment upon the sale or refinancing of the Property. The parties hereby agree that the Buyer shall provide written notice to the Seller of any such sale or refinancing. Such notice to Seller shall be directed to the Seller's [*sic*] at the Seller's address provided for in the

> Agreement (or other such address as Seller may provide
> written notice of to Buyer.

*Id.* The Amendment also contains Tolva's promise to advance the McVays $6,700 before

closing and the McVays' promise to repay the advance from funds received under the

Contingent Payment Clause. *Id.* We assume that a reasonable trier of fact could find from

the designated evidence that both parties did execute the Amendment. *See* Pls.' Resp.

Defs.' Obj. 17 (citing evidence). And the Tolva Entities concededly failed to give notice

of the 2014 Refinance to the McVays, by reason of which, the McVays contend, the

Tolva Entities are liable for breach of the Notice Clause.

The Tolva Entities essay to resist this result by contending, first, that the McVays'

*Amended Complaint*, Dkt. 42, stipulated that the Notice Clause requires notice only "in

the event of a sale or refinance of the [P]roperty *that would trigger*" Contingent Payment.

Defs.' Obj. R.&R. 11 (quoting Pls.' Am. Compl. ¶ 51). Because the 2014 Refinance did

not trigger a Contingent Payment, the Tolva Entities argue, the McVays' stipulation

requires a finding that the Notice Clause was not triggered either. This argument misses

the mark. "[P]arties cannot change the meaning of a contract by stipulation[.]" *Evansville

Courier Co. v. Uziekalla*, 81 N.E.3d 267, 270 (Ind. Ct. App. 2017) (citing *Price v.

Freeland*, 832 N.E.2d 1036, 1043 (Ind. Ct. App. 2005)). Thus, the Notice Clause means

what it says as a matter of law, no matter how the McVays characterized it in their

pleading. *RQAW Corp. v. Dearborn Cnty.*, 83 N.E.3d 745, 754 (Ind. Ct. App. 2017)

(citing *Eskew v. Cornett*, 744 N.E.2d 954, 957 (Ind. Ct. App. 2001)).

The Tolva Entities contend next that the Notice Clause embodies merely a gratuitous promise, unsupported by consideration, and is therefore unenforceable. Again the Tolva Entities' argument falls short. It is true that "[t]he modification of a contract, since it is also a contract, requires all the requisite elements of a contract[,]" including consideration. *Hamlin v. Steward*, 622 N.E.2d 535, 539 (Ind. Ct. App. 1993). "To constitute consideration, there must be a benefit accruing to the promisor or a detriment to the promisee." *Id.* (quoting *A&S Corp. v. Midwest Commerce Banking Co.*, 525 N.E.2d 1290, 1292 (Ind. Ct. App. 1988)). "A promise is . . . valuable consideration, and an exchange of mutual promises is consideration which supports modification of a contract." *Id.* An Indiana court does not inquire into the adequacy of consideration, but defers to the value judgments of the parties. *Id.* Here, the Amendment is supported by an exchange of mutual promises: Tolva's promise to give notice and to advance $6,700, in exchange for the McVays' promise to repay the $6,700. *See Long v. Straus*, 6 N.E. 123, 124 (Ind. 1886) (promise to repay is consideration supporting contract). Accordingly, neither the Amendment as a whole nor the Notice Clause in particular is unsupported by consideration.

The Tolva Entities have the better argument when they contend, finally, that the McVays' claim for breach of the Notice Clause must fail in the absence of evidence from which a trier of fact could find damages. We agree. "It is axiomatic that a party injured by a breach of contract may recover the benefit of its bargain but is limited in its recovery to the loss actually suffered." *L.H. Controls, Inc. v. Custom Conveyor, Inc.*, 974 N.E.2d 1031, 1043 (Ind. Ct. App. 2012). Here, the McVays have pointed to no evidence, and the

magistrate judge's report identifies none, as would competently prove the McVays' actual loss due to lack of notice of the 2014 Refinance. Even assuming that the McVays could have survived summary judgment simply by averring (which they have not) that, with such notice, their action for breach of the Contingent Payment Clause would have been brought sooner, thereby entitling them at least to lost interest on the judgment, still such an argument would have failed in this case, as the Tolva Entities did not breach the Contingent Payment Clause after the 2014 Refinance, and there will be no judgment in the McVays' favor. The McVays cannot have been damaged by the late discovery that they had not been damaged.

For the reasons above, we ADOPT the magistrate judge's recommendation as to the McVays' motion for partial summary judgment on the breach of contract claim; that motion should be and hereby is DENIED. We REJECT the magistrate judge's recommendation as to the Tolva Entities' motion for summary judgment on the breach of contract claim; that motion should be and hereby is GRANTED.

## II. Unobjected Rulings and Recommendations

Neither party has objected to the magistrate judge's evidentiary rulings, nor to his recommendation that the Tolva Entities' motion be granted as to the McVays' fraud claim. Accordingly, we ADOPT the magistrate judge's report as to these matters and GRANT the Tolva Entities' motion for summary judgment as to merged Counts II and IV.

<u>**Conclusion**</u>

For the above reasons, the magistrate judge's report is ADOPTED as to the

McVays' motion for partial summary judgment, Dkt. 91, which is DENIED. The report is

ADOPTED in part and REJECTED in part as to the Tolva Entities' motion for summary

judgment, Dkt. 94, which is GRANTED in full.

Final judgment shall be entered by separate document. Fed. R. Civ. P. 58(a).

IT IS SO ORDERED.


Date:  _____12/21/2017_____                    _Sarah Evans Barker_____
                                               SARAH EVANS BARKER, JUDGE
                                               United States District Court
                                               Southern District of Indiana

Distribution:

Sean P. Burke
MATTINGLY BURKE COHEN & BIEDERMAN LLP
sean.burke@mbcblaw.com

Robert R. Clark
TAFT STETTINIUS & HOLLISTER LLP
rclark@taftlaw.com

Hamish S. Cohen
MATTINGLY BURKE COHEN & BIEDERMAN LLP
hamish.cohen@mbcblaw.com

Todd J. Ohlms
FREEBORN & PETERS LLP
tohlms@freeborn.com

Verona M. Sandberg
FREEBORN & PETERS LLP
vsandberg@freeborn.com

Steven C. Shockley
TAFT STETTINIUS & HOLLISTER LLP
sshockley@taftlaw.com

Emily J. Stine
Freeborn & Peters LLP
estine@freeborn.com